IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


QUINN CONSTRUCTION, INC.        :        CIVIL ACTION
                                :
        v.                      :
                                :
SKANSKA USA BUILDING, INC.,     :
et al.                          :        NO. 07-406


MEMORANDUM

McLaughlin, J.                                    August 3, 2010

        This is a dispute over the construction of Skirkanich

Hall, a bioengineering building owned by the University of

Pennsylvania ("Penn").  Quinn Construction, Inc. ("Quinn") has

sued the architect Tod Williams Billie Tsien Architects ("TWBTA")

and the general contractor Skanska USA Building, Inc.

("Skanska").  Against TWBTA, Quinn claims damages resulting from

allegedly incomplete plans and specifications.  Against Skanska,

Quinn claims unpaid contract balance, unpaid change orders, and

damages resulting from delays and disruptions to its work.

Skanska has cross-claimed against Quinn for damages resulting

from delay to the completion of the project.  Skanska has also

filed a third-party complaint against Harleysville Mutual

Insurance Company ("Harleysville"), seeking payment of two surety

bonds that Harleysville issued for Quinn's performance.

        Each of these four parties has now filed a motion for

summary judgment.  The Court herein addresses Harleysville's

motion, Quinn's motion, and Skanska's motion.

Harleysville moves for summary judgment on Skanska's claims for payment of the surety bonds. Quinn moves for partial summary judgment, on Skanska's claims for damages related to delays that occurred after October 25, 2005. Skanska also moves for partial summary judgment, on Quinn's delay and disruption damages claims and 25 of Quinn's change order claims.

The Court will deny Harleysville's motion for summary judgment, deny Quinn's motion for partial summary judgment, and grant in part Skanska's motion for partial summary judgment.

I.   Factual Background

This action concerns the construction of Skirkanich Hall, a bioengineering research building at Penn. Penn, the owner, hired TWBTA as architect for the project. In a separate agreement, Penn hired Skanska as construction manager for the project. Skanska in turn hired Quinn to perform concrete work on the project, under two separate contracts ("the subcontracts"). Harleysville issued two surety bonds for Quinn's performance under the subcontracts.

Construction of Skirkanich Hall began in August 2004 and was substantially complete by June 2006. Facts surrounding the construction process are complex and disputed. The Court will address these facts as part of its summary judgment analysis.

A.    <u>The Terms of the Subcontracts</u>

The parties do not dispute the terms of the two agreements between Skanska and Quinn.  Under the first agreement (the "Foundation Subcontract"), Quinn agreed to perform concrete work on Skirkanich Hall's foundation for $913,920 payment from Skanska.  Under the second agreement (the "Building Subcontract"), Quinn agreed to perform concrete work on the building's superstructure for $5,903,760 payment from Skanska. The Foundation Subcontract and the Building Subcontract were both drafted by Skanska, and are substantially similar.  The subcontracts cover (among other matters) the scope of the work, scheduling and acceleration, liability for delays and disruptions to the project, and payment for change orders.

Both of the subcontracts are in 31 articles, each article divided into several sections.  The subcontracts' first article is a brief "Description of Work."  Section 1.2 provides that Quinn, in exchange for payment from Skanska, "shall perform the Work in strict compliance with the drawings, specifications, addenda and bulletins thereto" prepared by TWBTA.  Section 1.4 provides that the drawings "may not be fully developed," and that Quinn nevertheless "agrees to perform all work not specifically mentioned in the aforementioned documents but which is required to make the Work complete" according to Skanska, TWBTA, and Penn.

Article 3 of the subcontracts gives Skanska absolute and exclusive control over the project's schedule. Under section 3.4, "[t]he scheduling of all construction operations at the Project, including the Schedule, shall be at the option of Skanska," and under section 3.2 "[t]he Schedule may only be modified by Skanska, at its sole discretion, and [Quinn] agrees to comply with such modification.

Article 3 also covers overtime work. Section 3.7 provides that "should Skanska judge that [Quinn] is delaying the process of the Work or not complying with the Schedule," Quinn must "employ additional workmen, equipment and supplies, as required, so as to bring the Work into conformity with the Schedule or as required by Skanska." Section 3.7 gives Skanska the right to accelerate Quinn's work, at Quinn's "sole expense," if Skanska determines that such acceleration "is necessary to comply with the Schedule" given delays caused by Quinn or simply Quinn's failure "to be in conformity with the Schedule." Section 3.9 states that "[i]f the progress of the Work or of the Project is delayed not because of any fault or neglect" of Quinn, or "for any other reason Skanska deems appropriate," Skanska "may direct [Quinn] to work overtime and if so directed [Quinn] shall work said overtime and Skanska will pay [Quinn] for such overtime in an amount equal to the actual additional wages paid, if any, at rates which have been approved in writing by Skanska."

Article 4 covers "Price and Payments" and, in relevant part, entitles Skanska to withhold payment from Quinn for departing from the contract terms. Section 4.6 states that if Quinn "fails to perform," Skanska has the right to "retain from any payment" an amount it deems sufficient to compensate itself and Penn for "any and all losses, liability, damages, costs and expenses" sustained "in connection therewith."

The subcontracts go on to provide that Skanska is not liable to Quinn for damages caused by delays or disruptions to Quinn's work on the project. Under section 5.2, Quinn agrees not to "seek compensation or damages from Skanska" for delay to or interference with its work "by any other subcontractor or material supplier on the Project." Under section 5.5, Quinn accepts "any and all risks of increase in the price of labor and materials," and agrees not to claim any such price increases against Skanska. Finally under section 5.4, Quinn agrees that Skanska and Penn are "not liable, absent actual fraud, for any damages or costs due to delays, accelerations, impact, non-performance, interferences with performance, suspension or changes in the performance or sequence of" Quinn's work. Section 5.4 also provides that Skanska "shall have the right, at any time, to delay, accelerate, or suspend the commencement or execution of the whole or any part of the Work, or vary the sequence or performance thereof, without compensation to [Quinn]"

other than a time extension "for a period equal to such delay or suspension."

Article 9 of the subcontracts is devoted to "Change in the Work," and covers Quinn's right to payment for extra work items, or change orders. Section 9.5 provides that Skanska may submit disputed change orders to Penn for payment, and Quinn is then bound both "by the determination of [Penn]" and to "accept such payment, if any, as specified by [Penn] as full and final payment for all claims submitted." Section 9.5 specifies that if Penn determines "the work is not an extra, or awards no payment for such," Quinn must "accept said determination and payment as payment in full." Section 4.8 states generally that "Skanska shall be under no obligation to pay [Quinn] for any work done on this Project, until and unless Skanska has been paid therefor by [Penn]," and that Quinn "expressly accepts the risk that it will not be paid for work performed by it in the event that Skanska, for whatever reason, is not paid by [Penn] for such Work."

B.  <u>The Terms of the Surety Bonds</u>

The Foundation Subcontract and the Building Subcontract are each the subject of a performance bond issued by Harleysville Mutual Insurance Company. These two performance bonds were also drafted by Skanska and are, like the subcontracts, substantially

similar.  Each bond incorporates the terms of the subcontract it insures.

The bonds first create an obligation owed by Quinn and Harleysville to Skanska and Penn.  Each bond states that Quinn, as principal, and Harleysville, as surety, are "jointly and severally bound" unto Skanska and Penn in a sum equal to the value of the underlying subcontract ($913,920 for the bond insuring the Foundation Subcontract, and $5,903,760 for the bond insuring the Building Subcontract).

The bonds then set out conditions relieving Quinn and Harleysville of their obligation to Skanska and Penn.  Each bond states that if Quinn (1) performs "every and all of the provisions of the Contract" with Skanska "in the manner and within the time therein set forth," (2) holds Skanska and Penn harmless from "any loss or damage occasioned to any person or property" in the course of performance, and (3) indemnifies Skanska and Penn against "any loss, liability, cost, damage or expense, including attorney's fees, by reason of the failure of performance," then Quinn and Harleysville's obligation "shall be void."  Otherwise, their obligation "shall be and remain in full force and effect."

The last provision of the bonds is that "[i]t is understood and agreed that a Dual Obligee Rider is attached."  Each Dual Obligee Rider conditions Harleysville and Quinn's

indemnity obligations on Penn and Skanska's adherence to the
terms of the subcontracts.  The Riders provide "there shall be no
liability under this bond" to Penn or Skanska unless Penn and
Skanska "make payments to [Quinn] strictly in accordance with the
terms of the said contract as to payments," and "perform all of
the other obligations to be performed under said contract at the
time and the manner therein set forth."


II.  <u>Standard of Review</u>

        A party moving for summary judgment must show that
there are no issues of material fact and that judgment is
appropriate as a matter of law.  Fed. R. Civ. P. 56(c).  The
moving party bears the initial burden of showing that there are
no issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 323 (1986).  Once a properly supported motion for summary
judgment is made the burden shifts to the non-moving party, who
must set forth specific facts showing that there is a genuine
issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
250 (1986).


III. <u>Analysis</u>

    A.  <u>Harleysville's Motion for Summary Judgment</u>

        The Court first addresses Harleysville's motion for
summary judgment on Skanska's claims for payment of the surety

bonds.  This is Harleysville's second motion for summary judgment
on these claims.  In support of its first motion, Harleysville
argued that the plain language of the bonds did not obligate it
to indemnify Skanska under any circumstance.  The Court rejected
Harleysville's position and denied its motion, finding that the
bonds "expressly impose an obligation on Harleysville (and
Quinn)."  Memorandum and Order of Dec. 8, 2008 at 4.

Harleysville now claims that it is entitled to summary
judgment on two grounds.  First, it again contends that "the
Bonds do not state that Harleysville owes Skanska an indemnity
obligation."  Harleysville Mem. at 6.  As discussed, the Court
has already rejected this position.  Harleysville lends it no new
support.  Neither of the cases that Harleysville cites for the
principle that indemnity agreements should be strictly construed
against the party that drafts them, Lackie v. Niagara Machine and
Tool Works, 559 F. Supp. 377 (E.D. Pa. 1983), and Ratti v.
Wheeling Pittsburgh Steel Corp., 2000 Pa. Super. 239, 758 A.2d
695 (2000), is on point.  Both Lackie and Ratti construe
indemnity obligations narrowly against the drafting party, but
only in scope.  Lackie, 559 F. Supp. at 380; Ratti, 758 A.2d at
705.  In neither case does the drafting party dispute the
existence of any indemnity obligation, as Harleysville does here.
Furthermore neither Lackie nor Ratti involves interpretation of a
surety bond, or of language resembling the terms at issue here.

9

Neither case, therefore, undermines the on point authority the Court relied on in its earlier decision. See Memorandum and Order of Dec. 8, 2008 at 5-6 (citing Tudor Dev. Group, Inc. v. U.S. Fid. & Guar. Co., 692 F. Supp. 461, 465 (M.D. Pa. 1988); Pa. Supply Co. v. Nat. Cas. Co., 152 Pa. Super. 217, 31 A.2d 453 (1943)).

        Second, Harleysville contends that even if the bonds do obligate it to indemnify Skanska, the terms of the Dual Obligee Riders condition its obligation on Skanska's "full payment" to Quinn. Harleysville Mem. at 4. Harleysville is incorrect. The language of the Dual Obligee Riders is clear that Harleysville's indemnity obligation is not conditional on Skanska's full payment to Quinn, as Harleysville claims, but rather on Skanska's payment to Quinn in accordance with the terms of the subcontracts. Noting this, Skanska concedes that it did not pay Quinn in full but raises facts to show that its payment to Quinn was nonetheless in accordance with the terms of the subcontracts. Relying on its expert report, Skanska claims $1,860,304 in damages due to Quinn's deficient performance. Skanska Opp'n to Harleysville at 11 (citing Quinn Mot. to Preclude Testimony of Kost and Farooqi, Ex. C at 110). Section 4.6 of the subcontracts entitles Skanska to withhold payment for such damages, and Quinn claims far less than $1,860,304 in unpaid contract balance. It follows that Skanska has met its burden of production to show it

paid Quinn in accordance with the terms of the subcontracts, and the terms of the Dual Obligee Riders do not entitle Harleysville to summary judgment.

This analysis is not upset by any of the three cases Harleysville cites on the issue.  Enterprise Capital, Inc. v. San-Gra Corp., 284 F. Supp. 2d 166 (D. Mass. 2003), and Roel Partnership v. Amwest Surety Insurance Co., 258 A.D.2d 780, 685 N.Y.S.2d 832, (N.Y. App. Div. 1999), and North American Specialty Insurance Co. v. Chichester School District, 2000 WL 1052055 (E.D. Pa. 2000), are merely instances of a court excusing a surety of its liability under a performance bond where a condition precedent to the surety's liability was not satisfied. These cases do not merit summary judgment for Harleysville because, as discussed, there is evidence that the condition precedent to its liability was satisfied.


B.    Quinn's Motion for Partial Summary Judgment

Quinn moves for partial summary judgment on Skanska's claims for damages related to project delays that occurred after October 27, 2005, the date Quinn "topped out" Skirkanich Hall. Quinn contends that it cannot be responsible for these damages because its work was not on the project's "critical path" after that date.  The Court will deny Quinn's motion, because a genuine

issue of fact exists as to whether Quinn's work remained on the critical path after October 27, 2005.

Quinn is correct that it cannot be held liable for damages caused by delays that occurred after it completed its work on the project's critical path. "Critical path" is a term of art, not a legal concept; a project's critical path is simply a collection of those construction tasks that cannot be delayed without delaying the entire project. 5 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner and O'Connor on Construction Law § 15:120 (West) (citing G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 728 (1984)); Haney v. United States, 230 Ct. Cl. 148, 167, 676 F.2d 584, 595 (1982). Tasks on the critical path must be completed before other tasks on the critical path can be undertaken. Haney, 230 Ct. Cl. at 167, 676 F.2d at 595 ("E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed."). However tasks not on the critical path can be undertaken simultaneously with tasks on the critical path, and therefore do not affect the project's overall duration. Shupe, 5 Cl. Ct. at 728.

It follows that if some project delay occurs after a subcontractor has completed its tasks on the critical path, the subcontractor cannot have caused that delay and therefore cannot be held liable to the general contractor for any damages

attributable to that delay.  See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1233 (10th Cir. 1999) ("While [Critical Path Methodology] has generated a technical terminology, the legal requirement that it is used to analyze is general and commonsensical: a contractor must prove that a delay affected not just an isolated part of a project, but its overall completion.").  This is consistent with Pennsylvania law.  See Logan, 410 Pa. Super. at 448, 600 A.2d at 226 ("In order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss.").

Thus if it was undisputed that Quinn completed its critical path tasks on October 27, 2005, Quinn's motion might succeed.  However Skanska contends that "Quinn's work was on the critical path long after October 27, 2005."  Skanska Opp'n to Quinn at 4.  Skanska supports its position with two sources in the record.  First, Skanska presents four contemporaneously prepared schedule updates that each show several Quinn work items on the critical path after October 2005.  Farooqi Decl. ¶¶ 3-6, Exs. A-D.  Second, Skanska presents the testimony and report of its expert Zafar B. Farooqi.  Farooqi concludes that Quinn's work after October 27, 2005, "had a devastating effect on the work of follow-on trades" and that "Quinn didn't go off the critical path" until "the spring of 2006."  Quinn Mot. to Preclude

13

Testimony of Kost and Farooqi, Ex. C at 66; Decl. of Alan Winkler in Opp'n to Quinn Mots. for Summary Judgment and to Preclude Expert Testimony, Ex. G at 78.

Farooqi's testimony and report are the subject of a motion in limine that is pending in this case. However the resolution of that motion is not dispositive here, because the contemporaneously prepared schedule updates, which Quinn has not moved to preclude, are sufficient evidence to raise a genuine issue of fact as to whether Quinn's work was on the critical path after October 27, 2005. This issue of fact preserves Skanska's damages claims for trial, and requires the Court to deny Quinn's summary judgment motion.

C.    Skanska's Motion for Partial Summary Judgment

The Court now turns to Skanska's motion for partial summary judgment. Against Skanska, Quinn claims unpaid contract balance, damages resulting from delays and disruptions to its work, and unpaid change orders. Skanska has moved for summary judgment on Quinn's delay and disruption claims and 25 of Quinn's change order claims. The thrust of Skanska's argument is that these claims are barred by the terms of the subcontracts.

The Court finds that the terms of the subcontracts bar all of Quinn's delay and disruption claims except its claims for overtime wages. The terms of the subcontracts also bar 18 of

Quinn's change order claims.  The Court will therefore grant

Skanska summary judgment on those 18 change order claims, and on

Quinn's delay and disruption claims that are not for overtime

wages.  The Court will deny summary judgment on Quinn's claims

for the remaining seven change orders and Quinn's claims for

overtime wages.


     1.   <u>Quinn's Allegations of Bad Faith</u>

     In response to Skanska's position that its claims are

barred by the terms of the subcontracts, Quinn alleges that

Skanska "acted in bad faith in the performance and enforcement of

the subcontracts."  Quinn contends that Skanska breached its

implied duty of good faith and fair dealing under the

subcontracts, and therefore cannot rely on the terms of the

subcontracts to bar Quinn's claims.  Quinn Opp'n to Skanska at

10.

     Because Skanska relies on the terms of the subcontracts

in arguing for summary judgment on both Quinn's delay and

disruption claims and Quinn's change order claims, it is a

threshold question whether Quinn's allegations of bad faith

present an issue for trial.  They do not.

     Pennsylvania courts do recognize an implied duty of

good faith and fair dealing in the performance of a contract.

<u>Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co.</u>,

385 Pa. Super. 30, 35, 560 A.2d 151, 153 (1989).  This duty has been defined as "honesty in fact in the conduct or transaction concerned."  Id.  In Pennsylvania the duty of good faith has only been enforced in limited situations.  Id. at 35-36, 560 A.2d at 153-154 (identifying cases in which Pennsylvania courts have held parties in breach of implied good faith requirements, none of which is analogous to the case at bar).  Courts are especially reluctant to impose an implied duty of good faith in the absence of a dispute about the parties' reasonable expectations under a particular term of the contract.  Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 617 (3d Cir. 1995).  Pennsylvania courts would not impose a duty of good faith independent of any contractual term where, as here, two sophisticated business entities have engaged in an arms-length transaction.  Id. at 618.  In general, good faith requirements are not used to override the parties' agreement for reasons of fairness, policy, or morality.  Id. at 617.

Quinn alleges that Skanska acted in bad faith on three grounds.  First, Quinn claims that "Skanska repeatedly refused to honor contractual provisions in the subcontracts."  Quinn Opp'n to Skanska at 10.  This claim is simply too vague to raise a genuine issue of fact as to Skanska's bad faith.  Quinn does not identify any contractual provision that Skanska refused to honor.

Second, Quinn claims that Skanska "asserted that Quinn was in default when Quinn was not delaying the project." Quinn Opp'n to Skanska at 10. Because sections 3.2, 3.4, and 3.7 of the subcontracts provide that scheduling is at Skanska's sole discretion and that Quinn must follow the schedule, it would "override the parties' agreement" to impose an implied duty of good faith constraining Skanska's authority to assert that Quinn was behind schedule. Duquesne, 66 F.3d at 617. Furthermore even if this Court did subject Skanska's scheduling practices to an implied duty of good faith, Quinn's claim would not present an issue of material fact because Quinn does not allege that Skanska breached its duty. Quinn alleges only that Skanska's assertions that Quinn was in default were false. Quinn does not allege that Skanska knew that its assertions were false, and therefore does not allege that Skanska acted without "honesty in fact in the conduct or transaction concerned." Creeger, 385 Pa. Super. at 35, 560 A.2d at 153.

Third, Quinn claims that Skanska "refused to process legitimate change orders and progress payments." Even if the Court did subject Skanska's payment of Quinn to an implied duty of good faith, this claim would not present an issue of material fact because Quinn has not met its burden of production to show that Skanska's refusal to pay Quinn was in bad faith. Quinn's President Elizabeth Quinn, Vice President Shawn Quinn, and former

17

Project Manager Eric Publicover do allege that Skanska acted dishonestly.  E. Quinn Aff. ¶ 18; S. Quinn Aff. ¶ 33; Publicover Aff. ¶¶ 48-49.  But their affidavits do not contain any facts to support that conclusion, and their allegations of bad faith find no support elsewhere in the record.

Quinn's claims that Skanska breached its implied duty of good faith raise no issue as to whether Skanska can rely on the subcontracts in arguing for summary judgment.  The Court will therefore consider Skanska's arguments that the terms of the subcontracts bar Quinn's delay and disruption claims and Quinn's change order claims.

## 2.  Quinn's Delay and Disruption Claims

The construction of Skirkanich Hall was behind schedule when Quinn began its work on the project, and fell further behind over the course of Quinn's work.  Responsibility for the delay is disputed.  For the purpose of evaluating Skanska's motion for summary judgment, the Court must consider the facts surrounding the delay in the light most favorable to Quinn.

Quinn's account of the delay is based on the reports of its expert The Duggan Rhodes Group ("DRG").[1]  DRG found 6.5 weeks

_____

[1]     Skanska has moved to exclude The Duggan Rhodes Group's reports, on the ground that they are based on an incorrect legal standard.  However in supporting its motion for partial summary judgment, Skanska does not dispute any of DRG's factual findings or contend that Quinn's case turns on the admissibility of DRG's

of delay to Quinn's foundation work and two weeks of delay to Quinn's superstructure work.  Meller Decl. in Support of Skanska Mot. to Exclude Expert Testimony, Ex. C ("DRG Delay Report") at 25, 40.

Of the 6.5 weeks of delay to Quinn's foundation work, DRG attributes two weeks to Quinn's own deficient performance, three weeks to deficiencies in TWBTA's drawings, and 1.5 weeks to winter weather and holidays.  The initial schedule for Quinn's foundation work did not anticipate winter weather and holidays because it had a run date of June 26.  According to DRG, Quinn only worked during winter because the start of its work was delayed about four months "as a result of actions and/or inactions of others."  DRG Delay Report at 22, 26, 31.

DRG found that the two weeks of delay to Quinn's superstructure work "was a critical path delay to Project completion that is attributable to Quinn."  However DRG also concludes that Quinn's superstructure work was disrupted by "ongoing issues associated with TWBTA's design documents." According to DRG, TWBTA was slow to review structural drawings

---

reports.  Instead Skanska treats the reports as part of the record, even relying on them to make an argument for summary judgment on Quinn's delay and disruption claims (that the Court does not reach).  In light of this and because DRG's reports are helpful in understanding Quinn's delay and disruption claims, the Court will refer to the reports in its summary judgment analysis. However the admissibility of DRG's reports is not dispositive to the Court's decision on Skanska's motion for summary judgment.

and left critical dimensions out of its plans and specifications. These failures "continuously impacted" Quinn's work on the building superstructure. DRG Delay Report at 40, 42, 41.

DRG concludes that Quinn suffered $166,478 in damages related to delays to its work: $102,157 "general conditions costs" of remaining on the job longer than planned, and $64,321 labor escalation costs. DRG attributes all of Quinn's delay damages to the two weeks of delay to Quinn's work on the superstructure. According to DRG, the delay to Quinn's foundation work did not cause any damages. Meller Dec. in Support of Skanska Mot. to Preclude Expert Testimony, Ex. D ("DRG Damages Report") at 3, 6.

DRG concludes that Quinn also suffered $382,356 in "disruption-related costs." DRG attributes all of these disruption damages to Skanska-directed overtime: $187,290 in overtime and extra shifts, $20,304 in payment to one of Quinn's subcontractors for its overtime, and $174,762 in inefficiencies caused by accelerating work. DRG finds that all of Quinn's disruption damages, like its delay damages, were incurred during Quinn's work on the superstructure. DRG Damages Report at 3, 14.

Quinn has claimed these delay and disruption damages against Skanska. Skanska insists that it is not liable, and moves for summary judgment on three grounds. Skanska contends that Quinn's delay and disruption claims are barred (1) by

sections 5.2, 5.4, and 5.5 of the subcontracts, (2) by the releases Quinn signed each time it requested payment from Skanska, and (3) because Quinn sustained its delay and disruption damages while working on the building superstructure under the Building Subcontract, but only alleges breach of the Foundation Subcontract.

The Court finds that sections 5.2, 5.4, and 5.5 of the subcontracts preclude Quinn from recovering against Skanska for its delay damages and its disruption damages due to inefficiencies from accelerating work. On this basis, the Court will grant Skanska summary judgment on Quinn's claims for these delay and disruption damages. The Court will not grant Skanska summary judgment on Quinn's claims for overtime wages, because section 3.9 of the subcontracts may entitle Quinn to payment for its overtime work.

Sections 5.2, 5.4, and 5.5 of the subcontracts are "no damages for delay clauses," contract provisions which explicitly preclude a contractor from asserting delay and disruption damages against its employer. No damages for delay clauses are generally enforceable to bar delay and disruption claims. Guy M. Cooper, Inc. v. E. Penn Sch. Dist., 903 A.2d 608, 613 (Pa. Cmwlth. 2006). See also Lichter v. Mellon-Stuart Co., 193 F. Supp. 216, 221 (W.D. Pa. 1961), aff'd, 305 F.2d 216 (3d Cir. 1962). However Pennsylvania law recognizes that, notwithstanding a no damages

for delay clause, a contractor should not bear damages which are not contemplated by the contract and result from the employer's acts or failures. Henry Shenk Co. v. Erie County, 319 Pa. 100, 104, 106, 178 A. 662, 664-65 (1935). Accordingly, Pennsylvania courts have held that no damages for delay clauses do not bar a contractor's delay and disruption claims against an owner where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is failure on the part of the owner to act on some essential matter necessary to the prosecution of the work. Id. at 104, 178 A. 664; Guy M. Cooper, 903 A.2d at 613. These exceptions also apply to the enforceability of no damages for delay clauses that, like those at issue here, bar a subcontractor's claims against an owner's representative. See Lichter, 193 F. Supp. at 220 (applying Shenk to a no damages for delay clause in a contract between a subcontractor and a general contractor).

Thus sections 5.2, 5.4, and 5.5 of the subcontracts only preclude Quinn's recovery for delay and disruption damages that were contemplated by the subcontracts — damages that were not the result of (1) affirmative interference by Skanska with Quinn's work, or (2) failure on the part of Skanska to act in some essential matter necessary to the prosecution of the work.

Quinn alleges that Skanska affirmatively interfered with its work in six ways. However even viewed in the light most

favorable to Quinn, the record does not show that any of Quinn's delay or disruption damages are attributable to affirmative interference by Skanska or to Skanska's failure to act on an essential matter.

First, Quinn alleges that Skanska "routinely interfered with Quinn's relationship with Quinn's subcontractors." Quinn Opp'n to Skanska at 22. This allegation appears to refer to an interaction between Skanska and Quinn's subcontractor Ceco Concrete.[2] The record suggests that at some point before August 1, 2005, Skanska informed Ceco that it did not intend to pay Quinn for its work on the project, and planned instead to take Quinn to court. According to Ceco's District Manager Michael McDonald, this news "made Ceco concerned about working overtime on the project." McDonald Aff. ¶¶ 14-17, Ex. J.

Quinn never points to any fact in the record to show that Ceco's reluctance to work overtime interfered with its work, nor does it allege so with any specificity. Even Mr. McDonald's affidavit does not indicate that Skanska's communication with Ceco had any effect other than to make Ceco "concerned" and

---

[2]    Quinn's memorandum gives no explanation of its claim that Skanska routinely interfered with its relationship with its subcontractors. In support of this claim Quinn cites generally to the "Publicover Affidavit and Schmidt Affidavit." The 53 paragraphs of Mr. Publicover's affidavit, however, contain no mention of any interaction between Skanska and a Quinn subcontractor. Paragraphs 20-22 of Mr. Schmidt's affidavit discuss Skanska's interaction with Ceco.

"reluctant."  McDonald does not claim that Skanska's interference actually caused a drop in Ceco's overtime or a delay to the project.  McDonald Aff. ¶¶ 13–17.  The affidavit of Klaus Schmidt, another Ceco employee, confirms that Ceco expended considerable overtime despite its concern that Skanska would not pay Quinn.  Schmidt Aff. ¶¶ 21–23.  Thus while Quinn has met its burden of production to show that Skanska communicated with Ceco and that this communication made Ceco reluctant to work overtime, it has not met its burden of production to show that the communication constituted affirmative interference with its work.

Furthermore, Quinn does not allege that any of its delay or disruption damages were caused by contact between Skanska and Quinn's subcontractors.  The Duggan Rhodes Group's reports do not mention any such contact.  DRG finds all of Quinn's delay and disruption damages due to other causes.  On these facts, no reasonable jury could attribute any of Quinn's delay or disruption damages to Skanska's contact with Quinn's subcontractors.  It follows that this contact would not preclude Skanska from relying on the subcontracts to bar any of Quinn's delay or disruption damages, even if Quinn had met its burden of production to establish that the contact interfered with its work.  See Lichter, 193 F. Supp. at 221 (finding that even if a contractor could establish that the owner breached the construction contract, the contract's no damages for delay clause

would bar the contractor's damages claims because the record presented "[n]o basis for a reasonably accurate computation of damages attributable only to the alleged breach").

Second, Quinn claims that "there were site conditions which affirmatively barred and impeded access to the site." According to Mr. Publicover, Quinn was "denied complete access to the work site" by the ongoing work of the caisson contractor, another subcontractor on the project. Quinn Opp'n to Skanska at 22; Publicover Aff. ¶ 24.

The Pennsylvania Supreme Court has twice found denial of access to a work site to constitute affirmative interference precluding the enforcement of a no damages for delay clause. Coatesville Contractors & Eng'rs, Inc. v. Borough of Ridley Park, 509 Pa. 553, 506 A.2d 862 (1986); Gasparini Excavating Co. v. Pa. Tpk. Comm'n, 409 Pa. 465, 187 A.2d 157 (1963). In both Coatesville and Gasparini, an owner sought enforcement of a no damages for delay clause to bar a contractor's claims for delay damages caused by a condition preventing access to the work site: in Coatesville an undrained lake, and in Gasparini the presence of another subcontractor. 509 Pa. at 555-57, 506 A.2d at 863-64; 409 Pa. at 471, 187 A.2d at 160. In both cases the owner had ordered the contractor to begin work despite knowing that it would be unable to access the work site. This fact was central to the supreme court's reasoning. Coatesville, 509 Pa. at 561,

506 A.2d at 866 ("Ridley Park's notification to the appellant to proceed with the excavation work when it was known that the lake was filled with water invalidated the exculpatory provisions of the contract"); Gasparini, 409 Pa. at 474, 187 A.2d at 161 ("[The owner] knew Manu-Mine would be occupying the area to the exclusion of Gasparini and in face of this knowledge ordered Gasparini to start operations when the work site was denied.  It cannot rely on the provision providing for no damages for delay . . . when [it] ordered [Manu-Mine] to proceed under the contract.").

Here, Quinn does not allege that Skanska had any knowledge of the conditions barring its access to the work site, or that Skanska ordered it to begin work despite those conditions.  Quinn does mention "Skanska's conduct in affecting Quinn's ability to access the job site or begin work," but the record evidences no such conduct.  Quinn Opp'n to Skanska at 22.  Because there is no indication that Skanska caused or was aware of Quinn's inability to access the work site, Quinn cannot establish affirmative interference under Coatesville and Gasparini.

This issue should instead be decided under Henry Shenk Co. v. Erie County.  In Shenk, the Pennsylvania Supreme Court considered a dispute over the remodeling of an Erie County courthouse.  319 Pa. at 102, 178 A. at 663.  The County had hired

Henry Shenk Company to work on the courthouse's stone facing. Shenk's contract contained a no damages for delay clause providing, in relevant part, that a reasonable time extension was Shenk's only remedy for delay caused by "any act or neglect" of "any other Contractor employed by the Owner."  Id. at 105, 178 A. at 664.  Shenk completed its work on the courthouse about a year later than planned, and sued the County for delay damages.  Id. at 102, 178 A. at 663.  Among other damages, Shenk alleged "unnecessary expense" caused by delay attributable to the stone erector, another contractor on the project.  Id. at 102, 108, 178 A. at 663, 665.  Noting that the County "took no affirmative steps" to cause this delay, the court held that Shenk's recovery was barred by the no damages for delay clause.  Id. at 108-09, 178 A. at 665-66.  The court concluded that "[n]o delay can be conceived of in the progress of the work that will more clearly come within" the clause than "delay by 'another contractor,'" and held generally that contract provisions "against delay of other contractors or other incidents of the work" include "delays of other contractors in connection with the work."  Id. at 104, 108, 178 A. at 664, 666.

Sections 5.2 and 5.4 of the subcontracts are two such provisions against delay of other contractors.  These provisions relieve Skanska of any liability for damages caused Quinn by the caisson contractor's delay in leaving the work site, because

27

here, as in <u>Shenk</u>, there is no evidence that Skanska took affirmative steps to cause the delay.  <u>See also</u> <u>Guy M. Cooper</u>, 903 A.2d at 615 ("an owner bears no responsibility for independent contractor delays absent affirmative or positive interference by the owner"); <u>Lichter</u>, 193 F. Supp. 216 (holding that a no damages for delay clause warranted judgment for a general contractor on its subcontractor's claims for damages caused by "failure of other subcontractors to complete their work pursuant to the Project Schedules").  Any delay to Quinn's work caused by the caisson subcontractor is contemplated by section 5.2 and 5.4 of the subcontracts, and does not constitute affirmative interference by Skanska.

Quinn's third claim of affirmative interference is on the basis of a direction from Skanska and TWBTA to change the concrete shoring requirements.  According to Klaus Schmidt, this direction "delayed the work of Ceco and, in turn, the work of Quinn."  Schmidt Aff. ¶ 18.  However Quinn does not allege, nor does the record show, that Skanska was responsible for whatever prompted the change to the shoring requirements.[3]  Thus Quinn has

---

[3]     TWBTA's notes from a "Camber and shoring meeting" of February 10, 2005, suggest the change to the shoring requirements was undertaken by Ceco at the recommendation of Severud Associates, consulting engineers to the project:  "It is the opinion of Severud Associates that it would be prudent to re-shore the ends of the cantilevers all the way to the basement level given the unpredictable nature of cantilevered structure in deflection.  Ultimately, this decision is the responsibility of the shoring engineer, Ceco."  Schmidt Aff., Ex. A at 3.

not presented evidence sufficient for a reasonable jury to conclude that Skanska's direction to change the shoring requirements was anything more than a necessary, albeit unexpected, step towards the proper completion of Quinn's work on Skirkanich Hall. Such a direction is contemplated by section 1.4 of the subcontracts, and therefore cannot constitute affirmative interference with Quinn's work. See Shenk, 319 Pa. at 104, 178 A. at 665 (holding that no damages for delay clauses cover "delays which are covered by the contract or reasonably anticipated from the circumstances attending the project.").

Fourth, Quinn alleges "scheduling interferences" and that Skanska "denied extensions of time requests which were legitimate and warranted." Quinn's Opp'n to Skanska at 22. Quinn does not point to facts in the record to support either of these allegations. Furthermore any scheduling interferences or denial of time requests fall within Skanska's exclusive and absolute scheduling power under sections 3.2 and 3.4 of the subcontracts, and therefore do not qualify as affirmative interference with Quinn's work. See Shenk, 319 Pa. at 108, 178 A. at 665 ("Nothing was done outside of the contract for construction."). Any damages Quinn may have suffered as a result of Skanska's scheduling practices are "covered by the contract." Id. at 104, 178 A. at 665.

29

Fifth, Quinn claims that Skanska failed to "properly coordinate the work and provide accurate contract plans and specifications." Quinn Opp'n to Skanska at 24. Quinn does not cite to the record in support of this claim, but elsewhere in its memorandum does raise facts to show that it suffered delay damages due to inaccurate contract plans and specifications — the allegedly faulty "100%" drawings prepared by TWBTA. Quinn Opp'n to Skanska at 3-4 (citing Publicover Aff. ¶¶ 15, 50-51). The faulty drawings cannot constitute affirmative interference by Skanska, because they were TWBTA's responsibility. Quinn does not allege that Skanska provided it any plans or specifications, and Skanska had no contractual obligation to do so, or to ensure the accuracy of TWBTA's drawings.

The cases Quinn cites on this issue, ILM Systems, Inc. v. Suffolk Construction Co., 252 F. Supp. 2d 151 (E.D. Pa. 2002), and Eaton Electric v. Dormitory Authority of the State of New York, 2008 WL 5005264 (N.Y. Sup. Ct.), are distinguishable. ILM Systems and Eaton Electric are holdings that a no damages for delay clause does not warrant summary judgment on damages caused by inaccurate contract plans and specifications. 252 F. Supp. 2d at 157; 2008 WL 5005264 at *7. However in both cases, unlike here, the party seeking to avail itself of the no damages for delay clause did provide the suing contractor with inaccurate

plans.  252 F. Supp. 2d at 157; 2008 WL 5005264 at *4.  Under
Pennsylvania law it is clear that no damages for delay clauses do
apply in the situation at bar — where the architect, not the
owner or general contractor, provides the inaccurate plans.  See
Shenk, 319 Pa. at 107, 178 A.2d at 665 ("But this was an 'act of
the architect.'"); Lichter, 193 F. Supp. 216 (finding a no
damages for delay to bar recovery against a general contractor
for damages caused by the architect's issuance of 192 change
orders and the architect's failure to make prompt decisions).

        Sixth and finally, Quinn claims that "damages as a
result of Skanska's interference are set forth in the report of
its experts" The Duggan Rhodes Group.  Quinn Opp'n to Skanska at
24.  Quinn is incorrect; DRG's reports do not suggest that Quinn
suffered any damages due to affirmative interference by Skanska.
The only damages set forth in DRG's reports that have any
connection with Skanska are inefficiency costs resulting from
acceleration of Quinn's work on the building superstructure.  DRG
Damages Report at 19, 23; DRG Delay Report at 50, 53.  Skanska
might be said to have caused these damages, because it ordered
the acceleration.  However section 5.4 of the subcontracts
contemplates any order from Skanska to Quinn directing that Quinn
accelerate its work, and any damages that might ensue from the
acceleration.  Like Skanska's scheduling practices and the change
to the shoring requirements, acceleration of Quinn's work is

31

covered by the subcontracts.  It also does not constitute affirmative interference with Quinn's work.

In addition to arguing that Skanska interfered with its work on Skirkanich Hall, Quinn claims that Skanska committed "actual fraud in its dealings with Quinn."  Quinn Opp'n to Skanska at 17.  Quinn's allegations of fraud go to the enforceability of section 5.4 of the subcontracts, which provides that it applies to bar claims for delay and disruption damages "absent actual fraud."

Under Pennsylvania law, actual fraud has five elements: there must be (1) a misrepresentation of material fact, (2) scienter, (3) intention by the maker of the misrepresentation to induce the recipient to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result.  <u>Kuehner v. Parsons</u>, 107 Pa. Cmwlth. 61, 64, 527 A.2d 627, 629 (1987).  Quinn contends that Skanska committed actual fraud in three ways.

First, it claims that Skanska made misrepresentations "surrounding the completeness" of TWBTA's "100%" drawings.  Quinn Opp'n to Skanska at 20.  In support of this claim Quinn cites generally to five affidavits, none of which suggests Skanska ever made any representation to Quinn about the completeness of the "100%" drawings.  Section 2.1 of the subcontracts merely incorporates the drawings as part of the subcontracts.  It cannot

be read as a representation of the completeness of those drawings, especially because section 1.4 of the subcontracts is explicit that the drawings "may not be fully developed." Quinn has not met its burden of production to establish even the first element of fraud, misrepresentation, with respect to the "100%" drawings.

Second, Quinn claims that Skanska "falsely represented to Quinn that it was behind schedule." Because sections 3.2 and 3.4 of the subcontracts provide that scheduling is at Skanska's sole discretion, Skanska cannot have made any misrepresentations about the schedule.[4] Furthermore, Quinn has not met its burden of production to establish scienter with respect to Skanska's scheduling demands. The assertions of Ms. Quinn, Mr. Quinn, and Mr. Publicover that Skanska's representations about the schedule were "false" and "intended to induce Quinn to accelerate its work" simply do not support a conclusion that Skanska knew its representations were false. E. Quinn Aff. ¶ 19; S. Quinn Aff. 23; Publicover Aff. ¶ 25. Quinn presents no other evidence that Skanska's scheduling demands were in bad faith.

Third, Quinn claims that Skanska did not honor its promise to pay Quinn's overtime wages if Quinn met "certain

_____

[4] Even representations by Skanska that are inconsistent with the existing project schedule can be characterized as schedule modifications. Quinn agreed to comply with such modifications – including those that might render it behind schedule – under section 3.4 of the subcontracts.

milestones." Quinn Opp'n to Skanska at 21. In its memorandum Quinn alleges that it met the milestones, but this allegation finds no support in the record. Without any evidence that it met the milestones, Quinn must rely on one email between Penn and Skanska to establish that Skanska's conditional promise to cover its overtime wages was a misrepresentation. The Court, however, does not have to decide whether, giving all justifiable inferences to Quinn, this email and the affidavit of Shawn Quinn are sufficient evidence for a reasonable jury to conclude that Skanska committed actual fraud because the Court will deny Skanska summary judgment on Quinn's claims for overtime wages on another ground.[5]

---

[5]    In his affidavit, Shawn Quinn states that Skanska's Senior Vice President Paul Nylund represented to him that "if Quinn would meet certain milestones Penn and Skanska would pay for the overtime work which Skanska was directing." Mr. Quinn alleges that Mr. Nylund's representation was "false and fraudulent" and that "Skanska had no intention of ever paying Quinn" based solely on an email from Penn to Skanska concerning Penn and Skanska's negotiations over acceleration costs. S. Quinn Aff. at ¶ 31, 33.

    Mr. Quinn claims that this email establishes that at the time of Mr. Nylund's representation, "Skanska and Mr. Nylund had already represented to Penn that it did not intend to reimburse Quinn for overtime." This claim can only be true if Mr. Quinn's meeting with Mr. Nylund was before June 15, 2005, the date upon which, according to the email, Penn and Skanska determined that "The alternate 'carrot' approach, including Penn possibly contributing to some Quinn premium time costs, will not be used presently." Mr. Quinn avers that his meeting with Mr. Nylund was "[i]n or about June 2005." S. Quinn Aff. ¶ 31, 32, Ex. H. Therefore to conclude that Mr. Nylund's representation was in bad faith requires at least the inference that "in or around June 2005" means "after June 15, 2005."

34

The Court instead turns to Quinn's final attempt to preserve any of its delay and disruption claims: the argument that section 3.9 of the subcontracts "specifically permits Quinn to recover its overtime costs." Quinn contends that section 3.9 requires Skanska to compensate it for its overtime wages despite the "various provisions that ostensibly bar [its] delay and disruption claims." Quinn Opp'n to Skanska at 29.

Evaluating Quinn's argument requires the following basic rules of contract interpretation. A contract must be so construed, if possible, as to give effect to all of its provisions. <u>Harrity v. Continental-Equitable Title & Trust Co.</u>, 280 Pa. 237, 241, 124 A. 493, 494 (1924). An interpretation will not be given to one part of a contract which will annul another part of it. <u>Id.</u> at 242, 124 A. at 494. However, specific provisions will be regarded as qualifying the meaning of broad general terms in relation to a particular subject. <u>A.G. Cullen Const., Inc. v. State System of Higher Educ.</u>, 898 A.2d 1145, 1168 (Pa. Cmwlth. 2006).

These rules support the following interpretation of the subcontracts with regard to Quinn's overtime wages. Section 3.9 must be read together with sections 3.7 and 5.4, the other provisions of the subcontracts governing Skanska's obligation to compensate Quinn for accelerating its work. Section 3.9 qualifies the meaning of section 5.4, but only in relation to

overtime wages that Quinn incurred to accelerate work when "the Project [was] delayed not because of any fault or neglect" of Quinn. Section 3.9 requires that Skanska compensate Quinn for these wages, despite the general language in section 5.4. However overtime wages that Quinn incurred to remedy its own delay or failure "to be in conformity with the schedule" fall under section 3.7. Section 3.7 provides that these wages are "at Quinn's sole expense."

Whether the subcontracts require Skanska to compensate Quinn for its overtime wages, then, turns on whether Quinn worked overtime under section 3.7 or section 3.9. No evidence has been raised that Skanska or Quinn explicitly invoked either subcontract provision in their communication during the construction of Skirkanich Hall. However the record suggests that Skanska directed Quinn to work overtime on the basis that it was behind schedule due to its own deficient performance, and that, until their relationship soured, Skanska and Quinn had a mutual understanding that Quinn was not entitled to payment for its overtime wages.[6]

_____

[6] Skanska has maintained that Quinn was behind schedule due to its own deficient performance since at least November 4, 2004, 10 days after Quinn began its work on Skirkanich Hall. Publicover Aff., Ex. C at 2 ("Please submit a schedule indicating how you plan to get back on schedule. You will need to anticipate longer days, weekends, increased manpower, etc."); DRG Delay Report at 27. Skanska's communication with Quinn suggests that Skanska made all of its acceleration demands on this basis. These demands often included assertions that Quinn's overtime

36

The Court nonetheless declines to conclude that Quinn's overtime wages are subject to section 3.7 of the subcontracts. A genuine issue of fact exists as to whether Skanska accelerated Quinn's work to recover for delays that occurred before Quinn commenced work on Skirkanich Hall. Quinn may have expended overtime wages when "the Project [was] delayed not because of any fault or neglect" of Quinn,[7] and therefore may be entitled to

---

costs would be at its own expense. S. Quinn Aff., Exs. F at 6, G. Quinn presents no evidence that Skanska ever guaranteed that it would compensate Quinn for its overtime wages.

Furthermore, the record indicates that Quinn complied with Skanska's acceleration requests despite expecting that Skanska would cover its overtime wages. On March 4, 2005, Eric Publicover wrote that "it is now time for the Skanska organization to chip in" for overtime costs, and by April 14, 2005, it was Quinn's position that "any and all overtime work performed by the Quinn Construction, Inc. from inception to date will be at the account of Skanska, USA." Publicover Aff., Ex. H at 3; S. Quinn Aff., Ex. F at 6. However by this time Quinn had already "worked over 1,200 hours of overtime" without requesting any additional compensation from Skanska, and while "fully aware of the payment provisions and the language inserted into [its] subcontract document." Publicover Aff., Exs. E at 1, H at 3. Even after stating that it would pursue "a claim for all overtime expended on this project," Quinn wrote Skanska that it continued "to plan on overtime work until you [Skanska] advise us otherwise." S. Quinn Aff., Ex. G.

[7]     In response to Skanska's many demands that it accelerate its work, Quinn has insisted that it was not behind schedule and that it was not responsible for any delays to the project. Publicover Aff., Ex. D; S. Quinn Aff. ¶ 21, Exs. E at 2, G. Quinn's position is substantiated by a letter that Skanska wrote to Penn on January 25, 2007. In the letter, Skanska acknowledges delays to Quinn's work due to unanticipated instructions from the engineer and problems with TWBTA's drawings. According to Skanska, at least some of these delays "cause[d] the need for overtime to help mitigate." Lee Aff., Ex. C at 4.

compensation for those wages under section 3.9 of the subcontracts.

The terms of the subcontracts do not preclude Quinn's claims for overtime wages as a matter of law. The Court must therefore address Skanska's other two arguments for summary judgment on these claims.

Skanska contends that all of Quinn's delay and disruption claims are barred by the terms of the releases that Quinn signed each time it requested payment from Skanska. Skanska is correct that the plain language of the releases bars Quinn's claims for overtime wages.[8]  See Kenneth Hauntman, Inc. v. Whiting-Turner Contracting Co., 2008 WL 4072591 (E.D. Pa. 2008); G.R. Sponaugle & Sons, Inc. v. Hunt Constr. Group, Inc., 366 F. Supp. 2d 236 (M.D. Pa. 2004).  However the releases do not entitle Skanska to summary judgment on those claims, because a genuine issue of fact exists as to whether Skanska waived enforcement of the release language with respect to Quinn's overtime costs.[9]

----

[8]     Each release states, in relevant part, that Quinn "does hereby . . . waive, release, and relinquish any claims for additional compensation of any kind, including delay, disruption, interference, or acceleration accruing prior to" the date of the release's execution.  Quinn's overtime costs accrued prior to the date that it executed the most recent release.  Healy Decl., Ex. D; DRG Delay Report at 41.

[9]     Waiver is a voluntary and intentional abandonment or relinquishment of a known right.  Samuel J. Marranca Gen. Contracting v. Amerimar, 416 Pa. Super. 45, 49 (1992).  Waiver of

Skanska's final argument for summary judgment on Quinn's claims for overtime wages is that Quinn cannot recover for its delay or disruption damages because it sustained those damages during its work on Skirkanich Hall's superstructure under the Building Subcontract, but only alleges breach of the Foundation Subcontract. Skanska contends that Quinn "has impermissibly sought to fuse the two contracts into one." Skanska Mem. at 24. This argument is incorrect as a matter of law. Damages resulting from a breach of contract are generally recoverable; it is irrelevant whether they accrue during the performance of a second contract. See <u>Logan v. Mirror Printing</u>

---

a written agreement may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to rely on the agreement as to leave no opportunity for a reasonable inference to the contrary. <u>Id.</u>

Quinn raises several facts to show that Skanska acted inconsistently with a purpose to rely on the releases to bar Quinn's claims for overtime costs. Elizabeth Quinn and Quinn's counsel Christopher Lee both aver that when they presented Quinn's delay and disruption claims to Skanska, Skanska did not assert that the claims were barred by the releases. Lee Aff. ¶ 2, 5; E. Quinn Aff. ¶ 19, Exs. F, G. Skanska also failed to indicate that Quinn's delay and disruption claims had been released in the spreadsheets used by Quinn and Skanska to track Quinn's overtime costs. Publicover Aff., Ex. J at 48, 50. Most significantly, the record suggests that Skanska made many attempts to secure payment for Quinn's overtime wages from Penn. Lee Aff., Ex. C at 5; S. Quinn Aff., Ex. H.

Skanska does not address these facts, nor dispute Quinn's claim that they "warrant a finding that Skanska waived the operation of the release language." Quinn Opp'n to Skanska at 14.

Co. of Altoona, Pa., 410 Pa. Super. 446, 448, 600 A.2d 225, 226 (1991).

### 3. Quinn's Change Order Claims

In addition to delay and disruption damages, Quinn seeks payment for work it performed on Skirkanich Hall that was not anticipated by the as-bid plans and specifications. Quinn's extra work items, or change orders, are recorded in a spreadsheet Quinn refers to as the "change order log." Quinn Opp'n to Skanska at 6; Publicover Aff, Ex. J.

Skanska moves for summary judgment on Quinn's claims for payment of certain 25 change orders (Quinn's "change order claims"). These 25 change orders are listed on the second page of Skanska's draft order, and consist of 24 completely unpaid orders and one partially paid order. The partially paid change order is for "courtyard site work" and totals $518,226, of which Skanska has paid Quinn $70,000. Quinn's Opp'n to Skanska at 6; Skanska Statement of Facts ¶ 27 (citing Healy Decl. ¶ 11).

The history of these 25 change orders is disputed. Skanska's version of the facts is substantiated by the declaration of Michael Healy, who relies on his personal knowledge as Skanska's senior project manager for Skirkanich Hall. According to Mr. Healy, Skanska was never paid by Penn for 24 of the 25 change orders, and was paid only $70,000 for the

remaining change order (the courtyard site work order). Healy Decl. ¶ 1, 11, 13. Quinn disputes this account of Skanska's payment by Penn, but without any support in the record.[10] On the facts before the Court, no reasonable jury could disagree with Mr. Healy that Penn paid Skanska only $70,000 towards Quinn's 25 outstanding change orders (all of which Skanska has already paid Quinn).

Mr. Healy also alleges that 18 of the 25 change orders were rejected outright, as opposed to merely not paid for, by Penn and TWBTA. Healy Decl. ¶ 10. Quinn also denies this allegation, but again finds no support in the record.[11]

---

[10] In its response to Skanska's statement of facts Quinn "expressly denie[s] that Penn did not pay Skanska for the extra work claims asserted by Quinn." Quinn does not cite to the record in support of this claim. Quinn Resp. to Skanska Statement of Facts ¶ 27. The materials Quinn does cite on the issue of Skanska's payment by Penn, two excerpts from its deposition of Paul Nylund, nowhere indicate that Penn paid Skanska for any of Quinn's extra work claims. Quinn Resp. to Skanska Statement of Facts, Ex. A.

[11] Quinn "denie[s] that eighteen of the extra work claims were denied by the Architect and Owner as these were being reviewed and negotiated as late as the summer of 2006." Quinn Resp. to Skanska Statement of Facts ¶ 24. The change order log supports Quinn's allegation that its extra work claims were still "being reviewed and negotiated" on June 29, 2006. See Publicover Aff., Ex. J (indicating that the ball was in Skanska's court on these claims). However Quinn presents no evidence on the fate of its change order claims after June 29, 2006, and therefore cannot establish that Penn and TWBTA did not reject its claims after that date. Thus Quinn cannot dispute Mr. Healy's statement that 18 of its change order claims were (at some point) rejected by Penn and TWBTA.

Therefore the Court must also accept Mr. Healy's account of the 18 rejected change orders as undisputed fact.

In October 2008, Penn and Skanska reached a settlement in this suit. Their settlement agreement requires Penn to pay Skanska for only four of Quinn's change orders, none of which is amongst the 25 orders at issue here. Quinn Resp. to Skanska Statement of Facts, Exs. B at 4-5, C at 4, Ex. E. In return for this and other compensation, Skanska agreed to "fully and finally settle all disputes, differences and controversies" with Penn, including its claims for payment of Quinn's "Pending" and "Rejected" change orders. Id., Exs. B at 3, 6, C at 3. Thus nonpayment of Quinn's change order claims was a stipulation of the Penn-Skanska settlement agreement.

Skanska argues that it is entitled to summary judgment on Quinn's change order claims because (1) all 25 of the claims are barred by sections 4.8 and 9.5 of the subcontracts, and (2) the 18 rejected claims are also barred by sections 8.4 and 9.5 of the subcontracts, on other grounds. The Court rejects Skanska's first argument, but agrees that section 9.5 of the subcontracts bars Quinn's 18 rejected change order claims. The Court will grant Skanska summary judgment on these 18 claims alone.

Skanska's primary argument for summary judgment on Quinn's change order claims is that they are barred by sections 4.8 and 9.5 of the subcontracts, because Penn never paid Skanska

for the change orders concerned.  Sections 4.8 and 9.5 of the subcontracts are "pay-if-paid" clauses, contract terms that condition Skanska's payment to Quinn on Skanska's receipt of funds from Penn.  See LBL Skysystems (USA), Inc. v. APG-America, Inc., 2005 WL 2140240 at *32 (E.D. Pa. 2005) (citing C.M. Eichenlaub Co. v. Fidelity & Deposit Co., 293 Pa. Super. 11, 14, 437 A.2d 965, 967 (1981)); Cf. Sloan Co. v. Liberty Mut. Ins. Co., 2009 WL 2616715 (E.D.Pa. 2009).  In Pennsylvania, pay-if-paid clauses are generally enforceable to bar a subcontractor's claims against a general contractor for payment, if the general contractor was never paid by the owner.  LBL Skysystems, 2005 WL 2140240 at *32; see also Cumberland Bridge Co. v. Lastooka, 8 Pa. D. & C.3d 475, 483 (Pa. Com. Pl. 1977).  Skanska has presented evidence that Penn paid it only $70,000 for the 25 change orders at bar, and that it has already paid this $70,000 to Quinn. Skanska has thus met its burden of production to establish that the pay-if-paid clauses in the subcontracts relieve it of any further obligation to pay Quinn for these 25 change orders.

     The pay-if-paid clauses nevertheless do not entitle Skanska to summary judgment on Quinn's change order claims, because nonpayment of Quinn's change orders was a stipulation of Skanska and Penn's settlement agreement.  As Quinn argues in its opposition, Skanska should not be allowed to hide behind conditional payment clauses when it agreed that Penn need not pay

43

it for the change orders. In support of this argument Quinn cites <u>Urban Masonry Corp. v. N & N Contractors, Inc.</u>, 676 A.2d 26 (D.C. Cir. 1996), a case on point in the D.C. Circuit. Applying Maryland law, the D.C. Circuit held that a general contractor could not rely on a pay-if-paid clause to bar its subcontractor's claim for interest where the general contractor "agreed to a settlement that failed to secure payments" for the subcontractor. 676 A.2d at 36. The settlement was a breach of the general contractor's implied duty not to frustrate any condition precedent to its performance under the subcontract. <u>Id.</u>

Skanska insists that <u>Urban Masonry</u> should not control because "there is no indication that the Pennsylvania courts [sic] would countenance any such non-contractual exception to the applicable unambiguous contract clauses." Skanska Reply to Quinn at 15. The Court disagrees. In general, courts are reluctant to enforce a conditional payment provision against an unpaid subcontractor that is not responsible for the condition giving rise to the payment defense. 3 Bruner & O'Connor, <u>supra</u>, § 8:49 (West). Accordingly, courts have consistently held as the D.C. Circuit did in <u>Urban Masonry</u>: that a settlement between an owner and a general contractor prevents the general contractor from relying on a pay-if-paid clause to deny payment to its subcontractors. <u>Id.</u> (citing <u>Moore Bros. Co. v. Brown & Root, Inc.</u>, 207 F.3d 717, 725 (4th Cir. 2000) ("if a promisor prevents

or hinders fulfillment of a condition to his performance, the condition may be waived or excused").

Pennsylvania courts would not disregard the great weight of authority on this issue. Pennsylvania law recognizes that pay-if-paid clauses present a condition precedent to payment, Cumberland Bridge Co., 8 Pa. D. & C.3d at 479-80, and that parties to a contract have an implied duty not to frustrate conditions precedent to their performance. Howley v. Scranton Life Ins. Co., 357 Pa. 243, 248, 53 A.2d 613, 616 (1947) ("It is a principle of fundamental justice that if a promisor is himself the case of the failure of performance either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."). By agreeing that Penn need not pay it for the change orders at issue here, Skanska frustrated a condition precedent to its payment of Quinn under the pay-if-paid clauses in the subcontracts. It would therefore offend "a principle of fundamental justice" to deny Quinn's change order claims under these clauses — especially considering that Skanska benefited from its settlement agreement with Penn. The Court will not grant Skanska summary judgment on the basis that Penn did not pay it for Quinn's change orders.

The Court must therefore reach Skanska's other argument for summary judgment on Quinn's change order claims. This argument only concerns the 18 claims that Mr. Healy avers were

rejected by Penn and TWBTA.  Skanska takes the position that
Quinn cannot recover for these claims because they "were rejected
by those who had the right to determine them under the terms of
the Concrete Subcontracts."  Skanska contends that sections 8.4
and 9.5 of the subcontracts condition Quinn's payment for
disputed change orders on the approval of TWBTA and Penn,
respectively.  Skanska Mem. at 27.

It is firmly settled by the law of Pennsylvania that an
agreement to refer disputes to arbitration will be sustained and
upheld where the power to pass upon the subject-matter in dispute
is clearly given to the arbitrator by the terms of the agreement.
Conneaut Lake Agric. Ass'n v. Pittsburgh Surety Co., 225 Pa. 592,
596, 74 A. 620, 622 (1909).  Arbitration clauses in construction
contracts are generally enforceable to bar recovery for work
items that were rejected by the arbitrator, usually an engineer
or architect.  See Ruch v. York City, 233 Pa. 36, 81 A. 891
(1911); Stierheim v. Bechtold, 158, Pa. Super. 107, 43 A.2d 916
(1945).  The arbitrator's decision is binding unless there is
proof of fraud, collusion or caprice.  Stierheim, 158 Pa. Super.
at 109, 43 A.2d at 917.

Section 9.5 of the subcontracts clearly gives Penn the
power to pass upon the 25 change orders at issue here.  It
provides that Quinn is not entitled to payment for disputed extra
work items not only if Penn "awards no payment for such," but

46

also if Penn "determine[s] that the work is not an extra."  Thus

section 9.5 is not only a pay-if-paid clause, but also an

arbitration clause establishing that Quinn is "bound by the

determination of the Owner" Penn.

     As a valid arbitration clause, section 9.5 entitles

Skanska to summary judgment on Quinn's 18 change order claims

that were rejected by Penn.  Quinn raises no facts to show that

Penn's decision to reject these claims was fraudulent, collusive,

or capricious.  There is no evidence that Skanska stipulated to

or influenced Penn's decision, or that the decision was part of

the settlement process.[12]  The decision is therefore binding on

Quinn.  See Ruch, 233 Pa. at 48, 81 A. at 895 ("There are no

facts stated which would warrant the conclusion that the

arbitrator acted other than as his best judgment dictated.")

     Having concluded that Quinn's rejected change order

claims are barred by section 9.5 of the subcontracts, the Court

---

     [12]    Quinn alleges that "[t]here has been no decision not to
pay those claims" other than Penn and Skanska's settlement
agreement.  Quinn Opp'n to Skanska at 27.  However this
allegation is not cited to the record, and finds no support
there.

     Skanska's version of the facts, that "[t]he rejections
by the owner and architect occurred long prior to the October,
2008 settlement," is substantiated by the uncontroverted
testimony of Mr. Healy and by Skanska's Statement of Claims.  The
Statement of Claims was filed in October 2007, a year prior to
the Penn-Skanska settlement, and lists Quinn change orders as
"Rejected by Penn."  Skanska Reply to Quinn at 15; Healy Decl. ¶
10; Quinn Resp. to Skanska Statement of Facts, Ex. B at 6-8.

need not reach Skanska's argument based on section 8.4 of the subcontracts.

IV.  <u>Conclusion</u>

        For the reasons herein stated, the Court will deny Harleysville's motion for summary judgment, deny Quinn's motion for partial summary judgment, and grant in part Skanska's motion for partial summary judgment.

        An appropriate order shall issue separately.